Julian A. Martin v. Commissioner.
Martin v. Commissioner
Docket No. 32225.
United States Tax Court
1952 Tax Ct. Memo LEXIS 83; 11 T.C.M. (CCH) 946; T.C.M. (RIA) 52282; September 22, 1952
*83 Respondent disallowed all amounts deducted by petitioner as expenses, contributions, and bad debts on his returns for the taxable years 1944 and 1945. Held, respondent's action is approved due to petitioner's failure to prove that the items were deductible. During 1944 and 1945, one of petitioner's employers advanced expense moneys pursuant to a written contract. Respondent included such sums in petitioner's taxable income for each year. Held, the sums advanced constituted funds of the employer, expended in his behalf and according to his directions, and were not taxable income of the petitioner. During 1944, petitioner realized $500 on the sale of office furniture, which he omitted from his income tax return for that year. Held, respondent properly included such sum in petitioner's 1944 taxable income. Part of the deficiency for each taxable year was due to petitioner's negligence, and respondent properly determined a five per cent penalty as provided by section 293 (a), Internal Revenue Code. Julian A. Martin, pro se. Arthur L. Nims, III, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion Respondent determined *84 deficiencies in income tax for the calendar years 1944 and 1945 in the respective amounts of $5,669.45 and $2,819.12, and five per cent negligence penalties in the respective amounts of $283.47 and $140.96. The issues for each taxable year are whether respondent erred: (1) in disallowing deductions for business expenses, contributions, and bad debts; (2) in including in petitioner's income certain sums received but not reported as income; and (3) in determining a five per cent negligence penalty. Findings of Fact Petitioner resides in New York, New York. For the taxable years, he filed his income tax returns with the collector of internal revenue for the third district of New York. In his 1945 tax return, he listed his occupation as "Manager." During the taxable years, petitioner's income was derived solely from his employment by Joseph Dunninger of New York, New York, and by Marrius Orenstein and Irving Unterman, trading as The Trade Laboratories, and located at 412 Halsey Street, Newark, New Jersey. He reported income from each employer for the taxable years as follows: Employer
1944
1945
Joseph Dunninger
$10,400.00
$2,000.00
The Trade. Laboratories
7,500.00
9,290.00
*85 Under date of December 30, 1943, petitioner entered into a written contract with Joseph Dunninger whereby the latter engaged his services for one year, commencing January 1, 1944, "at the total compensation of $10,400." Petitioner agreed "to the best of his ability to serve Mr. Dunninger in the necessary capacities covering the various activities of his exclusive talents, and to act as advance man, contact man, publicity and exploitation man when and if necessary. The said part of the second part [petitioner], also will travel wherever essential, perform his specialized services to the best interest of the party of the first part [Dunninger], and his representatives, agents, and sponsors." Dunninger agreed "to take responsibility and payment of all necessary expenses, pertaining to his work, for the duration of this contract and agreement. It is understood however by both parties, that the party of the first part, will allow the party of the second part, the arrangement of time schedules to fit his services." Petitioner was employed by The Trade Laboratories to sell their merchandise which included "toothpaste, shaving cream and other articles used by everybody, including the *86 United States Government." He solicited business from Government purchasing offices in Harborside, New Jersey, and Washington, D.C., from the U.S.S.R., and from any place where he thought he could make a sale. The amounts paid petitioner during the taxable years by The Trade Laboratories were commissions on business secured through his contacts. In 1938, petitioner became interested in a project known at first as the Pan-American Exposition, the purpose of which was to promote a permanent exposition which was to be located in Florida. In 1941, he caused a Florida corporation, Inter-American Exposition Corporation, to be organized to further the project, and thereafter spent considerable time and money in promoting it. During the taxable years, petitioner traveled to various parts of this country and Mexico promoting this project. While the Inter-American Exposition was to be a nonprofit organization, petitioner expected to profit from the venture through a contract with the Exposition Corporation giving him a percentage on all leases of property and operating concessions. At the time of the hearing, petitioner was continuing his efforts to establish the project. On his income tax *87 returns for 1944 and 1945, petitioner claimed expense deductions in the respective amounts of $5,200 and $6,139.13 ($7,514.13 less $1,250 for charities and $125 for bad debts). A breakdown of these expense deductions, as shown by the returns, reveals the following items were included: 1944
Item with Accompanying Explanation
Amount
Gifts, etc. All to promote business
$ 500.00
Phones (long distance, etc.), Tele-
grams, Messenger Service (Promotion
and Contact work)
250.00
R.R. fares (Wash., Phila., Newark,
Del., Long Island, etc.)
200.00
Entertainment Expense - Business de-
Mands all forms of entertaining, such
as dinners, travel, meals, drinks,
theatres, prize fights, concerts, etc.
(Promotion and Theatrical)
1,790.00
Office expense - 1501 Bway, and 345
Madison Ave., N.Y.C. - covering
rent, telephone, office help, office
supplies, incidental expense (Promo-
tion and Theatrical business)
2,000.00
Attorney fees - Includes consuation,
advice, contract forms, etc. (Promo-
tion and Theatrical business)
200.00
Rehearsal for plays - Cost of scripts,
incidental expense (Theatrical busi-
ness)
260.00
Total expense deductions claimed
$5,200.00
1945
R.R., plane, N. Y. cab fares
$1,261.66
Telephones, telegrams, stamps, etc.
656.12
Entertaining, luggage, attorney fees,
business gifts, photostats, etc.
1,911.00
Hotels, meals, tips, etc.
1,065.99
Printing and advertising
1,244.36
Total expense deductions claimed
$6,139.13
*88 For the taxable years 1944 and 1945, petitioner deducted contributions in the respective amounts of $2,685 and $1,250. In his 1944 income tax return, petitioner listed his contributions as having been made to "Church, Red Cross, Salvation Army." In his 1945 return, petitioner lumped his contributions with other miscellaneous expense items under the designation "Church & Charities." For the taxable years 1944 and 1945, petitioner claimed deductions for bad debts in the respective amounts of $200 and $125. In his 1944 income tax return, he explained the bad debts as follows: "Tried to collect many times several moved away to other states." In his 1945 return, petitioner made no explanation of the bad-debt deduction claimed thereon. During 1944 and 1945, petitioner received from Joseph Dunninger $3,600 and $550, respectively, which he omitted from his tax returns. Such sums represented "payment of all necessary expenses" by Dunninger under his contract with petitioner dated December 30, 1943. In determining the deficiencies herein, respondent included such amounts as taxable income from the respective years. During 1944, petitioner received $500 from the sale of certain office *89 furniture. Petitioner omitted this sum from his 1944 taxable income. In determining the deficiency for 1944, respondent included this amount in petitioner's taxable income. Petitioner maintained no books of accounts or records by which the deductions claimed on his returns as expenses, contributions, and bad debts could be substantiated. His receipted bills and other evidence of his expenditures had been lost or destroyed. Some of the amounts claimed as deductions were estimated. A part of the deficiency for each taxable year is due to the negligence of the petitioner. Opinion RICE, Judge: In this case petitioner maintained no books of account, checks, or other records which would substantiate his claimed deductions. He must of necessity, therefore, rely upon his oral testimony and his recollection to carry his burden of proof, for the respondent disallowed all of petitioner's claimed deductions in each taxable year for the reason that petitioner had not been able to justify the deductions. Respondent has also increased petitioner's taxable income in each taxable year by reasons of sums received from Dunninger in excess of petitioner's salary and in 1944 by reason of income *90 received on the sale of office furniture. On these additional income items, as on the claimed deductions, petitioner must depend largely on his own testimony to carry his burden of proof. The principal deductions claimed for each taxable year represented alleged ordinary and necessary expenses paid or incurred by petitioner in carrying on his trade or businesses. Petitioner testified that his only sources of income were his employment by Dunninger and The Trade Laboratories. One was a salaried job under a written contract, the other, according to petitioner's testimony, was selling on a commission basis. Petitioner testified that none of the $5,200 expense deduction claimed on his 1944 return was spent on behalf of Dunninger, and presumably the same holds true for the 1945 expense deduction of $6,139.13 in view of petitioner's position that Dunninger paid his expenses as provided in their 1944 employment contract. On crossexamination, petitioner testified that the 1944 business-expense deduction of $5,200 included expenses in connection with his employment by The Trade Laboratories; but he was unable to allocate any part of the total expenses claimed to that employment. He testified *91 specifically that the office-expense item of $2,000 included in 1944 expenses had nothing to do with The Trade Laboratories. Our understanding of petitioner's testimony and the exhibits received in evidence is that most of his claimed business expenses were expenditures in connection with what he termed his promotion and theatrical business and his Inter-American Exposition project. Exhibit one contains a partial list of 1944 rent and office expenses first at 1501 Broadway and then at 345 Madison Avenue in New York, New York. Petitioner did not to the nature of the business conducted at either office nor set forth any business reason for having an office. We can infer that he needed an office in connection with his self-styled "promotion and theatrical business", but such inference is hardly a satisfactory substitute for competent evidence. Exhibit B purports to be an itemized list of 1945 expenses submitted to the respondent by petitioner in support of his claimed 1945 expenses. The list totals $6,935.06, including a $1,250 item for church and charities and a $125 item for bad debts. No attempt was made by petitioner to tie the listed expenditures to any business activity in which *92 he was engaged. We can infer from his testimony and from the items listed on Exhibit B that his expenses to, from, and while in Mexico City related to his Exposition project, and that his San Francisco trip at the time of the United Nations conference was in furtherance of the same project. Likewise, other items listed on Exhibit B might, by inference, be tied in or related to petitioner's promotion of the Inter-American Exposition, but this is not proof that such expenditures are ordinary and necessary expenses of any business carried on by the petitioner. To secure the relief which he is here seeking, the petitioner must show that the expenditure was proximately related to the business in which he was engaged. Sarah Backer, et al., Executors, 1 B.T.A. 214 (1924); Kornhauser v. United States, 276 U.S. 145 (1928). We could not say with certainty upon this record that petitioner was engaged in any particular business. He testified that he was "a sort of a jack of all trades" for Dunninger. When asked by the Court, "What were those expenses [Exhibit 1] in connection with?", petitioner replied "* * * the fulfilling of my enterprise, and I was a promotional *93 man and was taking on any type of promotion." The Court then inquired "It wasn't limited to that Florida corporation?", and petitioner replied "Nothing was limited to anything. I planned to make a dollar everwhere I could. I went to Washington time and time again to see if I could recapture Government contracts." It is manifestly impossible to tie general testimony of this type to any particular business in which petitioner claims to have been engaged. In describing his relationship to the Inter-American Exposition Corporation, petitioner called himself "the executive director" and "the promotional director." He also testified that he received a contract from the Exposition Corporation to further promote the permanent exposition, but that it was "a nonprofit corporation, so therefore they had no funds." Many of petitioner's claimed expenses in 1944 and 1945 appear to have been related to this promotion, as he testified that every dollar he could lay his hands on was used in promoting the permanent exposition. He anticiatped a large income from the establishment of a permanent exposition, but the project was no nearer completion, at the time of the hearing than it was in the taxable *94 years. The expenditures petitioner made in promoting the exposition were not made in connection with any trade or business carried on by the petitioner. His expenditures were made in an effort to give value to the contract he held with the Inter-American Exposition Corporation covering leases of property and granting concessions. It would be unrealistic to view petitioner's activities in this regard as a trade or business. Cf. Frederick A. Purdy, 12 T.C. 888 (1949). We cannot on this record say that any of the claimed items of business expense have been established, nor can we find any basis for applying the Cohan rule. [1]
The deductions claimed as contributions on petitioner's income tax returns for 1944 and 1945 are unsupported by any documentary proof. Petitioner testified that the contributions were in cash and not by check. Respondent's counsel, in his opening statement, called attention to the fact that petitioner apparently took a blanket deduction for charitable contributions in the amount of 15 per cent of his gross income. In testifying to the contribution deductions, petitioner *95 stated: "I deducted - just as Mr. Nims stated, I took what was allowable, according to the report of the income tax return, for various charities and matters of that type." Petitioner admitted he used a blanket amount for his contributions and that he had no receipts for any of them. Such evidence forms no basis for allowing petitioner any deduction for contributions, and we approve respondent's determination. The evidence with respect to the bad-debt deductions is too indefinite, vague, and meager to permit any deduction. Petitioner's testimony indicated that the amounts deducted may not have been debts at all for he testified: "I had at that time, from 1943 on, a lot of people that rotated around me thinking I was going to hit the jackpot, and doing little courtesies for me, and I would hand out money in cash, and they would give me a little service in return. So I just wrote off $200, which was about one-fourth of the amount that I actually handed out." Petitioner also testified that the bad debts deducted consisted $5of items and $10 items from people who came to the office and "give you a little tap," and that he used them for runners and different things. Under such circumstances, *96 it is questionable whether petitioner ever expected repayment, and it is doubtful that a debt was created. Furthermore, petitioner made no attempt to establish the worthlessness of the debts, if debts, in fact, existed. Respondent's disallowance of the bad-debt deduction for each taxable year is approved. In determining the deficiencies for the taxable years, respondent increased petitioner's taxable income by $3,600 in 1944 and by $550 in 1945, representing additional sums paid to petitioner by Joseph Dunninger in the taxable years. Petitioner testified that these sums were received from Dunninger for expenses in connection with securing engagements for him as an entertainer. Petitioner denies that any part of such sums found their way into his pockets, but admits that he has no records to support his story that the sums were spent in Dunninger's behalf. There is no dispute about the amounts paid over by Dunninger or that petitioner received them; the question is whether petitioner should be charged with receiving income in the above amounts. In our opinion, petitioner should not be charged with these sums as income even though the evidence of record is not all that we would prefer. *97 Nevertheless, the contract of employment between Dunninger and petitioner specifically provides that Dunninger would pay "all necessary expenses, pertaining to his work, for the duration of this contract and agreement." The respondent's position, at the trial, was that petitioner did not expend the money in Dunninger's behalf, and, on brief, that petitioner had failed to carry his burden of showing that the amounts were disbursed as ordinary and necessary expenses of his employer. We are satisfied in view of the contract provisions and petitioner's oral testimony that these sums were spent for his employer and not on his own behalf. On this additional income item, we hold with the petitioner. The second item of additional income relates to respondent's determination that petitioner realized a $500 gain from the sale of office furniture in 1944. Petitioner's testimony is that he and a man by the name of Bowers started a venture known as Tiffany Enterprises in 1943. Bowers was to finance the venture up to $5,000, and petitioner was to operate it. Bowers advanced about $500, which apparently was used to open an office and acquire office furniture, and then quit, leaving petitioner to *98 operate without finances. Petitioner testified that he could not meet the expenses and sold the furniture for $500 to pay the bills. Whether the net result of Tiffany Enterprises was a loss, as petitioner declares, we do not know. But it is established that when Bowers left petitioner took over the furniture and sold it to settle his obligations. Petitioner has established no cost basis for the office furniture and admits that $500 was realized from the disposition thereof. Under such circumstances, respondent's determination that the $500 constituted additional income for 1944 is affirmed. The final issue is whether the five per cent negligence penalty provided by section 293 (a) of the Internal Revenue Code should be imposed. This section states that if any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, the five per cent penalty shall be imposed. It is our opinion that petitioner's claimed deductions were so overstated and exaggerated, particularly with respect to his deductions for charitable contributions, that he is chargeable with negligence. On this issue, we affirm respondent's *99 determination. Decision will be entered under Rule 50. Footnotes
1. Cohan v. Commissioner, 39 Fed. (2d) 540↩ (C.A. 2, 1930).